Next matter is Hay Group v. Schneider. Good morning, Your Honor. May it please the Court, I'm Jeremy Heap from the law firm of Pepper Hamilton. I'm here with my colleague and partner, Eli Siegel. I appreciate you doing that. We had arguments last week, and some poor associate or junior partner sat at the table who probably did all the work, as I said, and was never introduced. So thank you for doing that. You're welcome. You're welcome. I'd like to reserve two minutes with your approval, please. Okay. I'd like to address three points today. I'll start with 22B. I don't understand why this is not basically the same suit that was decided in Germany. It certainly arises from the same set of, I know nuclear effect is not in the restatement, but it's the concept of the same statement of operational facts. So to begin with, there are two separate claims. There's one claim that's about this bogus investigation, and then there's another claim that's about this defective assignment. And they have to be analyzed separately. What we believe happened is the smaller claim, which was the investigation claim, got wrapped up into the bigger claim. And so to answer your Honor's question, within the context of 22B, the district court's error below was simply not to apply the rule, which is that res judicata does not apply unless it is a compulsory counterclaim. Do you think there's been a problem with Rule 44.1 here in the determination of German law as to what needs to be included in a suit? Did the claim for the investigation under German law have to be included in the litigation? Yes, the essential error was that that question wasn't considered by the judge. What the judge below said is that there's a dispute between the experts about whether counterclaims are compulsory, but that's an irrelevant consideration. The consideration that's relevant is simply whether the claim could have been asserted in Germany. And that's a clear error under the restatement of judgment, section 22, which is why Mr. Schneider never... And under Rule 44.1, which states that it's a matter of law determining what the foreign law is, not for the judge to make a factual determination. Yes, Your Honor, that question should have been decided, except I would say that res judicata in the context of the investigation claim was never even raised by the other side. Why wouldn't, if you're right, why wouldn't the reversal here nullify the initial judgment? So Judge Davis, Judge LaGrom Davis, had this case for the first 13 years and he... Is that why he left the bench? It's been a long case. He obviously retired before this decision was made. But he actually, when, originally what happened is we had claims in Germany and claims in the U.S. And Judge Davis stayed the claims in U.S. because they actually were overlapping claims at the time. And he said, let's let the German claims go forward first. If the U.S. claim, if the U.S. entities are dismissed, then we'll allow them to come back. They were dismissed. He allowed them to come back. He looked at the investigation claims in particular and he said, and he did look at the look at what the law in Germany was. And he found that what was happening in Germany was a matter of whether there was a good cause termination. And under German law, you have to look at only the last two weeks of facts of what happened up to the termination. That's the law. The investigation that happened before that. And so what Judge Davis said in his decision of September 2014. And if I can just give you a reference, it's Joint Appendix 85 on the third page. Is that there's no way that res judicata could apply here because this is a completely separate claim that's not necessary to the good cause determination. Why is it on the merits? Why is it a separate claim? Aren't you requesting through your claim here a relief that could have been sought in the German litigation? So, again, I want it. I want to make sure I get to the bigger claim of the cost allocation and the assignment. The default, the assignment is what I think your honor's question is going to. But just to wrap up the investigation, which I think are as it was just just clear, just should just should not that claim should not have been dismissed. The the the reason is, is that it was completely irrelevant under German law. It happened in a different time period. The investigation happened entirely in United States, United States entities, United States witnesses primarily. And even the German court. And this is the last reference I'll give you on the investigation. And then I'll move on to the assignment claim. The German court itself did not even address in its decision. The investigation claim, the German court itself. And this is if I give you the reference to the investigation or the false investigation regarding the chief financial officer. Yes, exactly. It's Stephen K. based here in the United States and the Wanamaker building down the street investigated by a U.S. law firm headed up by the U.S. general counsel. Again, Judge Davis looked at this and said, of course, this is irrelevant. The German court is just is described in paragraph forty five B of the others. The expert on the other side name is T's a joint appendix six ninety seven. And what he actually says, if I can just read it, is the judgment of the higher regional court did not address the investigation against K in its grounds. The court deemed it not relevant. No, I don't have to. It just it just didn't have to. It was it. Well, was it before the German court? It was it was it didn't. This is the this. It was referenced in the in the background by the German court when it was describing what was going on between the parties. The plan is the cause of action. It was not planned as a cause of action. It did not need to be played as a cause of action. It was irrelevant. And that's why it's being asserted here in the U.S. But I guess my question is, why could you not have asserted it while the case was pending in Germany? I mean, it happened there. And I thought these in pressure agreed that you could have done that. It's it was it was possible. But again, that's not the legal. The legal test is whether it was a compulsory. All the events occurred in Germany. No, no. The the all of the most of them. And again, Judge Judge, the district court below Judge Judge Bartle did not address this. Judge Bartle only sort of swept it up in the bigger claim. What the what the the Third Circuit has said, Judge Higginbotham in the Athlon Industries case, is that, of course, there are things that are mentioned in different cases. But being mentioned or referenced doesn't amount to rest judicata. Judge Higginbotham says hopefully judges, as a quote, are wise enough to sift the wheat from the chaff and consider only those facts that are truly relevant to the issue in his or her immediate adjudication. Thus, overlap of irrelevant facts and possibly even tangential facts constitutes nothing more than surplus surplus. Now, for the harder question, that's the that's the easy question that that claim should clearly be reinstated. The harder question is the question of the assignment. And the the essential allegation there is that Mr. Schneider, after having been advised by outside counsel that he had to assign his employment agreement to this German entity. And after having been told by Deloitte and teach that secretly worked with his accountant in order to plant language into the assignment to ultimately make it defective. Is that in the record? That's in the record. It's set forth in our summary judgment brief, pages seven to 11, which are joint appendix 768 to 772 and 17 to 19, which is 778 to 780. The judge below made the same as the same question that you asked. He said, couldn't this claim? Couldn't it have been asserted? And the error that the court made is that the time under the Morgan bright line test of the Third Circuit, that that analysis has to be made. Is that the time of the filing of the German complaint, which is in 2003 and 2004? And during that time, Mr. Schneider was taking the position that this assignment had occurred. So there was no claim for Hager. It had occurred, though. Sorry? It had in fact occurred, hadn't it? You're saying that technically there's some problems with it. The question is, why didn't, why didn't, why wasn't there a counterclaim in 2003, 2004 against Schneider for for breaching his fiduciary duty by messing up this assignment language? He was taking a position that the contract had been assigned to Germany. Exactly. But he reversed course. He said, no, no, it's it's still subject to Dutch law. At that point, Hayes group knew that he had changed his mind. He had changed his position. And at that point, could you not have asserted account? The answer is whether it was possible, theoretically possible or not, is answered by the Third Circuit's Morgan case, which says that we're going to adopt the rule of our sister circuit courts. We're making a bright line. The test has to be at the time of the filing so that we don't have this kind of dispute and say could have, would have, should have at different points because there are different. With 22 B of the restatement, which it trumps 22 B of the restatement, because 22 B of the restatement, essentially the exception to the counterclaim to the compulsory counterclaim rule is if you're seeking to nullify the judgment. But you have to. The whole thing has to happen under Morgan, specifically in 2003 and 2004. If we agree with you, with your your position and you prevail, you effectively undermine the judgment of the German court. It's it's it's it's raising it's raising a claim that didn't exist in the at the time of the German court filing that under the supervision of Judge Davis over much objection. We were able to push and get this Hague Convention discovery. We got the discovery of the accountant who admitted candidly that Mr. Schneider had planted the language in this. He planted the language. I'm not sure that that was his. I'm sorry. You're absolutely correct. And the record, the citations are well set forth in our in our briefing. And I am clearly paraphrasing as an advocate. He certainly did not use that. He did not use the words planted, but he certainly admitted that he used the words for execution in order to favor Mr. Schneider's interest. Because he knew that he was in conflict with the company in case he were to be terminated, because he wanted to have an entity with who he could go after who was liquid. That's, again, paraphrasing. I don't have I'm not reading you the words, but that's the essence of his testimony. Couldn't have known that at the at at the time. And and that is set forth in the Doe versus ally case. It's it's this when a when a when you're when your opponent at the time of filing is pleading something that's consistent with your ultimate position, then you cannot you cannot challenge that. You have no no action. Our action in this case arose in 2014. The thing that bothers me is, is it is this change of position by Schneider? Is this is this should this be judicially stopped? Yes. Your Honor, particularly under the the crystal case that the court cited for us in anticipation of this argument. But the the fundamental essential rules of judicial estoppel is set forth in the two cases that your honor cited for us. Is that is that a party can't rely on positions that are irreconcilably inconsistent. And here, like in crystal that we have to look at whether those positions were irreconcilably inconsistent. But under Morgan, at the time of the filing of the of the German complaint. So in 2003, 2004, he's pleading that the assignment happened. So it's irreconcilably inconsistent for him to now assert rest judicata. And so in the in the words of crystal, you're correct. He says the assignment occurred, but he corrected that position in the German case. While the case was before the court in Germany, he said, no, no, it did not occur. And based on that position, the German court made a decision that he was entitled to his compensation precisely. Let me rephrase it. The ruling was that he was improperly discharged under Dutch law because the Dutch law governed the his rights. The ruling was was that there was a defective corporate formality. They never got to the good cause portion in in Germany. And it was the cause for the discharge that they never got to. The lower court found that there was good charge for good cause for the discharge. That was reversed. Then later when he he reversed position on the assignment and the court said, was he pursuing inconsistent positions in the Dutch litigation and the German litigation? He just he was. And this this goes to the judicial estoppel cases where you have these inconsistent positions. There can be a finding supports a finding of bad faith. So his position starts with there. There has been a simultaneous inconsistent position. Sorry. We're not simultaneous inconsistent. No, but again, we have to look at 2003, 2004. So that's that's why it's it's that's why estoppel kicks in that for for he's a stop from asserting res judicata now, because at that point in time when they're saying that we should have brought the counterclaim, there just was no there was no controversy at the time. He's just in time, I think he's just in time. Yes. Morning, Your Honors. Morning. My name is Carl. I'm from Alston and Bird. And we represent the athlete defendant and an athlete, Baron Schneider, in this long running legal saga. One might say never ending, never ending. I don't know if, you know, Jar and Dice versus Jar and Dice. I was thinking of that one. This this reminds me to be proud of you. Baron Schneider is now 17, a two year old man. I wish I were that young. But my point on this, Your Honor, is that he's been engaged in this litigation now for 16 years. And, Your Honors, I think understanding the context of what this case is about and it's all about the very same thing will assist greatly in resolving the legal issues before you. It's all about the same thing. Did you mean to say money or? Well, I think it's all about whether or not Mr. Schneider was wrongfully terminated. And what caused what was the basis for that termination? It's undisputed that he was terminated right after he commenced an investigation of Mr. K, the CFO of one of the hey, one of the hey, U.S. entities. No, he was like the father, the look at this like a mothership, the mothership entity. That was he was CFO of that. Hey, management, I guess it was. Yes. Hey, management was kind of the administrative services arm. And Mr. K took the position in his deposition that he was the CFO for the hey, conglomerate, which has been pursuing this litigation against Mr. Schneider. It all boiled down to which country's law applied, as I see it. Pardon me? It all boiled down to which country's law applied to to his discharge. Exactly. And the party well understood that at the outset. The parties knew there was an employment agreement. The hey, entities take the position that under the employment agreement, Mr. Schneider had to was compelled to assign his employment agreement to hey, Germany. There was a cost allocation agreement to avoid permanent establishment issues in other countries. Well, if Mr. Schneider was required to assign his contract to Germany, why did he bring the litigation in the Netherlands on the wrongful discharge? But he didn't run. He brought. Let me just go through the facts and I'll get them. I'll lay them out for you and I'll address your question right here. After he was terminated after the hey, investigation, he brought action in Germany saying he was wrongfully terminated by hey, Netherlands. Shortly thereafter, several months later, he said, oh, by the way, I'm pleading in the alternative here. I was also if it was a joint employer situation or if hey, Germany were my employer, I was wrongfully terminated by hey, Germany. Who else was confused? The hey, entities. The hey, entities sent out termination notices under from hey, Netherlands, hey, DV and from hey, Germany, hey, GMBH. Frankfurt Court District Court is looking at all this and says, you know, I really could get it would be nice to get some guidance from the Netherlands as to whether the termination is valid or invalid under Dutch law. And so right around the end of 2004, 2005, the parties go to the Netherlands. And Mr. Schneider at that point was taking alternative positions. Either I was employed by Germany or the Netherlands or both, but it was invalid under any set of laws. Interestingly enough, you don't hear this from the presentation of my colleague, and I understand why. The hey, entities took the position that there had been no assignment of the contract and that Dutch law applied, that hey, Netherlands was the employer. So you go through several years of litigation in the Netherlands. Ultimately, the Netherlands court says, guess what? Termination is invalid under Dutch law. Not surprisingly, at that point, the hey, entities say, wait, we're changing our position. We believe that the agreement was transferred to hey, Germany. So that German law applies. And it was still pending here, wasn't it? What's that? The case was still pending. The case was still pending. And Bernd Schneider, not surprisingly, said, I've argued in the alternative, but I'm no longer relying on an assignment of the contract to hey, Germany. Just to clarify, the case was started in Germany, and the German court transferred to the Netherlands just to get a ruling from the Netherlands as to which law applied. Well, no, as to whether the termination would be valid under Dutch law. But there had been litigation already started in the Netherlands. No. Litigation started in Germany, goes to the Netherlands. Bernd Schneider, an individual, is saying, OK, I will go, and I'll litigate wherever you tell me to. It was a transfer to the Netherlands? There was not a litigation? No, the Frankfurt court stayed its proceedings while the Netherlands proceeding was ongoing. And when had the Netherlands proceeding been initiated? I think around the end of 2004, early 2005. So it was already existing? Yes. Dr. Case goes through it in his affidavit. But that was just to get a final decision on the validity of the discharge? Under Dutch law. But was it understood that the case would end up back in Germany? Yes. And then the German courts took up the issue. It was like an advisory ruling. Well, but it was separate litigation in the Netherlands. Correct. Separate litigation in the Netherlands. But it wasn't simply as we certify an issue to the Pennsylvania Supreme Court. That's right. There was Netherlands litigation and German litigation. Correct. Correct. But the German litigation started. And then the German court said, well, looking at the same issue in the Netherlands, let's find out what's going to happen there. Correct. Correct. So that's what happens. So this argument that somehow the Hague entities took a different position based on the alternative pleading of Mr. Schneider makes no sense. Because even as the court. Which court? The German court. The Oberlandesgerichtshof, the higher regional court in Germany, points out in its decision that the Hague entities took the opposite position at the beginning of the case. They took the position that there had been no assignment and that Dutch law applied. And it was clear the reason why they changed position was right after the Dutch courts ruled that their termination notice would be invalid under Dutch law. Then they changed position. You're talking about the appellate Dutch court, not the trial? Yeah, the appellate. That's the only decision that's in front of you, Your Honor. I'm trying to restrict myself to the record here. So they didn't like the Dutch ruling. They didn't like the Dutch ruling. Well. Back to Germany. They were stuck by it because it went all the way up to the Supreme Court in the Netherlands. And then Mr. Schneider said, he's always said, I was wrongfully terminated under either Dutch or German law, regardless of who the employer was. But after the Netherlands finally resolved the issue, he said, I'm no longer relying on an assignment of the CEO agreement to Hague, Germany. And that way, Dutch law would apply. OK. It sounds like you got a final enforceable decision in Germany. Correct. What's wrong with the present case? The present case is trying to re-litigate the very same issue that was dealt with in Germany. Does re-judicata apply? Absolutely, Your Honor. A or B? Pardon me? Under A or B or both? Under both, Your Honor. And I think that... But the A litigation on the investigation did not, under German law, did not have to be brought, right? I think there's... It could have been, but it didn't have to be. Could have been brought, should have been brought, if it was going to be... But it didn't have to be. I don't know if it was a compulsory counterclaim under German law. Well, there was legal evidence that it didn't have to be. And under Rule 44.1, it's a matter of law which we can review de novo, right? You can review that de novo, but there is authority within the Third Circuit, and I point out the Kramer case that we cited to that says that any claim that once a court of competent jurisdiction has entered a final judgment on the merits of a particular case, the parties to that action are bound not only by every matter which was offered and considered in reaching... But that's not the issue that was decided here. The issue we've got to deal with is... But every other matter, too. Could... Did it have to be brought? And the German testimony from both sides says, well, it didn't really have to be brought. Right. So, therefore, it is still extant, and it shouldn't just have been dismissed without any further consideration. Well, I think that Mr... That's what I focused on B, I'm sorry. That's what I focused on 22B and not 22A. But I think the judge, the district court below, recognized that the Hague U.S. entities were parties to the litigation in Germany for several years. And they could have brought it, but they didn't, and they didn't have to. And they could have brought it, and they didn't. And isn't that the end of it? I don't think so under the jurisprudence in the Third Circuit. Well, under German law, that's what we've got to consider, is did they have to bring it in Germany, and they didn't. Well, I think... And so that they can bring it somewhere else. Well, the concept of res judicata, according to the... I'm not talking about res judicata. I'm talking about the claim for the investigation that was not a claim before the German court. It was mentioned in passing in the German court. It was mentioned in the decision, and it was the very basis for the entire action, this investigation.  Because it was cited as a reason for firing Mr. Schneider. Correct. But the damages caused by that investigation were not dealt with in the German case. They did not have to be dealt with in the German case. Under Rule 44.1, determining what German law is on joining claims, it did not have to be joined. So how can you simply dismiss it, the district court, without any further opportunity for the plaintiffs here to talk about it? It was simply swept in with the other cause of action. Well, I think because it says, Your Honor, Judge McKee noted earlier that cause of action is writ broad, and it includes... And under German law, it didn't have to be broad. Yeah, that's my understanding. It did not have to be broad. I think we're at loggerheads. But anyway, you know where I stand, and I know where you stand. I understand where you stand, Your Honor. But my position is that writ broadly, that was part of the same cause of action. Indeed, it was the very reason why the litigation was denied. Why don't you put your yellow lights on? We have a difference of opinion. So we move on to another... Mr. Sondland, she's the boss. Mr. Durkin, did I pronounce that correctly? Yes. Supposing we agree with Mr. Heap, and he can proceed with his claim and he prevails, what would be the effect of his prevailing here with respect to the German judgment? With respect to the German, it would be a nullification of the German judgment. It would be a decision that the German judgment had no merit. Okay. And one of the things I'll note in that... Bring us into the B portion of that, of Section 22. But explain that. I mean, your answer clearly got us on to 22B, but explain why that would necessarily follow. Because at the outset of the case, everybody knew the issue was what law applied. No. Or rather, who was the employer? That's the law. But would the judge... If Mr. Heap prevails, would you end up with inconsistent decisions? Yes. And that would affect the rights of the parties in terms of what, for example, what Mr. Schneider recovered in Germany? Yeah, that's exactly what they're trying to do here. Money back. Is trying to claw all that money back from Mr. Schneider. Would that be the result of Mr. Heap prevailing here in, I guess... Yes, that's their argument. And we think it's wrong. So that would upend the verdict in Germany. Absolutely, Your Honor. You know, one of the questions I have about this case is, this is all various hay entities. Why does it matter which particular hay entity has all of the money? I don't think it does, but that's the way they've set it up. They're saying that under the cost allocation agreement, and it's correct, under the cost allocation agreement, that Hay Germany was responsible for a portion of the salary, and then Hay Management was. The testimony below is in practice, salary of CEOs got spread out amongst all the hay entities. Ultimately, as you know from the German higher regional court, the court issued a judgment against Hay BV, not against Hay Management. There's a little bit of sleight of hand saying now... B is Hay Germany? No, Hay BV is the Netherlands, forgive me. Hay Netherlands. Hay GmbH is Hay Germany. Mr. Schneider would have had an uphill battle if the German court had decided that German law applies. Is that fair to argue? And that's exactly what their argument is. They're saying that the German court should have... And that's what they're asking for in the current litigation. And that's exactly what they're saying. They're saying that it should have been German law that applied. But your statements before suggested that they were taking inconsistent positions. Yes. In Europe, first they say that the Dutch law applied, but that didn't seem to favor them. And then so they went over to Germany. And then they went the other way. So they were strategizing which court would be most favorable. I mean, that's your argument. I don't want to... We've cited in the record, and I can cite to you where the German court recognized that the hay entities took a different position. It was in JA365. Hay Netherlands, not Hay Germany, was the other party to the CEO contract at the time the notice provision was given. The contractual relationship was not transferred to Hay Germany. This also corresponds to the point of view originally held by the Hay Company. Of course, Mr. Schneider was doing the same thing. Well, Mr. Schneider, everybody... Mr. Schneider was pleading in the alternative. He said, regardless of which company... Didn't he know who employed him? No. He got termination notices from two different entities. He believed that either it was Hay Netherlands, a joint employer situation, or Hay Germany. But it's clear that the hay entities also did not know for sure who employed him. Is Schneider an attorney? No. I'm kind of baffled, and I have been from the beginning, in terms of putting the responsibility for drafting the assignment under Schneider, as opposed to the entity's attorney. I agree with you, and I see I'm out of time, and if I can just respond to this... Go ahead. Mr. Schneider is not an attorney. There's no evidence that he planted information. There is evidence that the hay entities were told by a German who was looking at the cost allocation agreement that included the assignment provision, that take a look at the assignment provision, and you may want to check with your lawyers. They did not check with their lawyers. Mr. Schneider signed the cost allocation agreement that had the assignment language on behalf of Hay GMBH. Chris Matthews of the hay entities signed on behalf of the Hay USA entity, and also on behalf of Hay BB. They were instructed, or they were told, you may want to check with your attorney. There was some internal discussion about it. They never did. I'm sorry, they never did? They never consulted with an attorney about that language. That's the record. I think it's irrelevant. Mr. Schneider, all he was interested in with the cost allocation agreement was his tax advisors had said, you have to avoid permanent establishment issues, and you have had cost allocation agreements in the past. We should have one in place here as well at the hay entities. At the heart of this case is apparently Schneider's failure to assign his employment contract. Is that accurate? That's what they're arguing. I don't think he had an obligation to do it. Failure to assign it from the Netherlands to Germany. That's their argument. And that's their claim that they were prejudiced because otherwise it would have been resolved under German law. And that's exactly what their argument is. I dispute that that was an obligation on his part. Would the hay group have brought a counterclaim in the German litigation asserting that very fact? Absolutely. In other words, change of positions? Absolutely. They could have argued that. But they changed positions themselves. And this isn't like a fact that he was hiding. The Crystal Cadillac case is so different. There's no motive to fabricate here. There's no reliance by anybody on a prior decision. In that case, Your Honor, you recall that you had creditors that relied to their detriment. Nobody relied on the prior positions of the others. They were struggling to find out who the employer was and to make decisions on the basis of that. So I don't think the G1 Holdings or the Crystal Cadillac case or the Doe case that they cited are in any way applicable. Mr. Schneider was not hiding everything. Everybody knew the facts. There were two agreements, and the import of those agreements was what the parties litigated about, the employment agreement and the cost allocation agreement. And the parties clearly were not sure who the employer was, as evidenced by the fact that Hay Germany and Hay Netherlands each sent separate termination notices to Mr. Schneider. And Mr. Schneider then made claims that both of those notices were invalid. Thank you. Thank you, Your Honor. Thank you, Your Honor. Four quick points. Where did the obligation to assign come from? Was that in the initial employment agreement? It was in the initial employment agreement. And who was that agreement with? It's between Schneider and BV. And in the agreement itself, it says that the parties will assign to a third entity, and in particular Hay GmbH, which is the German entity. Management was not part of that. No, the assignment was to go to GmbH, the German company. From the Netherlands. Right, exactly, from Netherlands to Germany. And there is a dispute between us about whether the employment agreement, as a matter of law, required the assignment. That was part of what's been briefed on summary judgment. Our point is, to your question about whether Mr. Schneider was a lawyer, and of course the answer is no, is that he hired a firm called the Sherrard's firm to provide him analysis. And that firm extensively analyzed his duties under the employment agreement, and told him in writing that he should make sure to get this assignment completed fully. Did they draft the assignment? No, the whole drafting process was supervised by Mr. Schneider and Ms. Bowler. It was governed by German law. He was the German party. They were working with Deloitte in Germany. So on the Hay side, the Hay side had allocated the primary drafting work to Mr. Schneider. So he had gotten that advice. He didn't tell anybody that he had gotten that advice. He told the company through Deloitte in a letter that it actually had been fully assigned, as Deloitte had recommended. And then once again, it was only through this Hague Convention deposition that Judge Davis allowed us to have, that we were able to figure out what was actually happening, which is that the language was specifically designed in order to protect Mr. Schneider's personal interest. That's the breach of fiduciary duty. Advice of his law firm? Yeah, that he had received advice that he had to make the assignment, that he not only ignored the advice, but he failed to tell the company that he had gotten that advice. And he further did not tell the company that he was manipulating this language in a way to protect himself. He could have. There could have been a way to say, I want this language to protect myself. This is in my interest. I want the liability in this entity and not that entity. That all could have been done. But the breach of fiduciary duty was the self-dealing that ultimately led to this entire mess. They engage in questionable practices, indeed. I wanted to ask you about Hague Group, because this is your case. Could you touch on this idea that you were taking inconsistent positions? Initially, yes, Dutch law applied. And then, apparently, you became aware of what Dutch law provided for, and then you changed your position and said, no, no, German law should apply. Yes, Your Honor. So the first reference I'd like to give Your Honor in response to that question is J.A. 1135. This is a – and 1136. This is a complete recitation in the record of Mr. Schneider's pleaded positions. It's all line and verse to which paragraphs of which pleadings over a six-year period. And I am going to get to your question of his – of what his position was. It is correct that there came a point in time where Hague Group switched its own position on the assignment and said that it had – in the beginning it said it had not been assigned and then took the position that it had been assigned. All of that is irrelevant to the Morgan bright-line rule. The question, for res judicata purposes, is could we have asserted a claim in 2003-2004? And I would suggest that if Your Honors look at J.A. 1135, 1136, and see the six years of constant pleading, there was simply no case or controversy for the Hague Group to be able to assert a claim against Schneider. So that leaves us – leads to your question of, well, it doesn't – now if we assert that claim now, isn't it a nullification of the German judgment? And my answer is no. It's an endorsement of the German judgment. It's a claim under Morgan that we could not have brought at that time for res judicata purposes because of the conduct of the breach of fiduciary duty that we later found out about that we say was surreptitious. You didn't know about his conduct involving his disparaging the CEO and his conduct of having a law firm manufacture a sham investigation? You were not aware of that? I'm sorry. There are two totally separate issues in the case. So the conduct to which Your Honor just referred is the investigation. We knew all about that. We were deeply involved in that. In our view, that's a complete U.S.-based claim, U.S. entities, U.S. witnesses, and irrelevant in the words of their own expert to the German litigation. That was the dialogue that Judge Roth had with Mr. Geerken. So you made a decision that you would not include those claims in the German litigation? Yeah, those claims were just – they were irrelevant to the German litigation. We asserted those under permission of Judge Davis, explicit permission, here because they were separate claims irrelevant to the German. Historically, we actually – Was he one of the reasons he was fired? Wasn't that – No, no, no. That was some of the background that explains why there was tension between the parties. But it's completely inaccurate to say that the termination had anything to do with the investigation. The – under German law – and this is what's explained by Judge Davis after looking at the expert opinions. Under German law, you can only look at those last two weeks. The basis of the termination was that Schneider had entered into secret salary arrangements with his very close personal assistant, Lucy Bohr. And he – so he gave her – he raised her salary. He gave her separate – a special severance deal and then wrote a secret termination letter that they stuffed in a drawer and never told anybody about. One day she disappeared, claimed all this money against the company. Company says, what in the world is going on here, discovers it all, and fires him for cause. That – the basis for the termination is not the investigation. And the basis for the termination has to have been committed within two weeks of the termination? Correct, correct. Under German law. Under German law, under German law. So now – so the second part of your question is, well, didn't we know about the – about him getting advice from his law firm about how to – about that he had to assign it and that he worked with his accountant in order to protect himself over the interests of the companies. That all came out in Mr. Ressler's – the accountant piece came out in Mr. Ressler's Hague Convention deposition in 2016 under our breach of fiduciary duty claim here. Now my position is that under Morgan we could not have brought that claim in Germany, right-line rule. So therefore we have the claim. So they're not inconsistent decisions. We endorse and accept the German decision. The German decision is what it is. We had to pay and did pay the 13 million euros. Our case is that this was caused by his breach of fiduciary duty to the company by not disclosing his – that he was drafting the assignment clause in his personal interest and not in the interest of the company. How long was that before the termination, the assignment? How long was that before the assignment? The assignment was in 2003. The cost – in October 28, 2003, and the termination is in 2004, early 2004, late 2003, early 2004. Within two years. I just have one more question. Go ahead. What are you seeking in damages in your current litigation? We believe that the breach caused the 13 million euros in damages. We're not going to pay that money back. Yes, essentially we want – You say they're not related. I'm not saying they're not related. I'm saying under the Morgan bright-line rule I could not have asserted that claim in Germany in 2003, 2004. So your victory would completely, essentially undo the decision in Germany. I would put it differently. I would say that we would recover our damages that he caused us for his breach of fiduciary duty. They were awarded in Germany. Yes, that were awarded because of his conduct in Germany. Okay. Yes. All right. It is a bleak house. It really is. I didn't hear your last sentence. No, this really is a bleak house. Thank you. Thank you. Thank you. Thank you both. I'm going to get a transcript. I'll take a brief break. You have a five-minute break. And I'd like to get a transcript of the argument. And if you could consult with – I always mess up your name. I'm sorry. Ms. Stravinsky, is that right? Close enough, you're saying. About how to work out the mechanics of the transcript. Will do.